THEODORE SERR, Trustee in Bankruptcy of H. F. Smith, Bankrupt, Respondent, v. H. F. SMITH, et al. MANLEY SMITH and Arthur Porter, Appellants.

(224 N. W. 299.)

Opinion filed March 12, 1929. Rehearing denied April 6, 1929.

*Crum & Crum*, for appellants.

*J. K. Murray* and *Sullivan, Hanley, & Sullivan* for respondent.

BURKE, J. Theodore Serr, trustee in bankruptcy, of the estate of H. F. Smith, a bankrupt, brings this action to set aside a transfer made by the defendant, H. F. Smith, to his son Manley Smith, of the southwest quarter (SW¼) of section 9, township 129, range 82, and the assignment of a leasehold interest by the said H. F. Smith, to his said son, Manley Smith, in the southeast quarter (SE¼) of section 2, township 129, range 83, Sioux county, North Dakota, for the year 1927, also one McCormick-Deering tractor and tractor plows, and one Studebaker automobile transferred to his son-in-law, Arthur Porter, all transfers made without consideration and for the purpose of defrauding H. F. Smith's creditors. The other defendants all claim liens on

the property of the bankrupt which were adjudicated in the trial court and held to be liens against the bankrupt's property, all prior to any claim of the defendant, Manley Smith. The trial court made its findings of fact and conclusions of law, holding that all of said transfers were fraudulent and made with the intention of hindering and delaying the creditors of the bankrupt. Judgment setting said transfers aside was duly entered from which the defendants, Manley Smith and Arthur Porter, appeal.

The first two assignments of error relate to the admission of testimony, and. a motion to strike out the testimony in proof of fraudulent conveyances, upon the grounds that the allegations of the complaint were not sufficient to sustain such an action are without merit, as the title to the property of the bankrupt passed in law to the trustee on his appointment and clothed him with authority to bring the action. The other assignments relate to the sufficiency of the evidence to sustain the finding that the sales were fraudulent, without consideration, and for the purpose of hindering and delaying creditors in the collection of their claims. This involves a review of the evidence, which we have carefully examined and which leads us to the conclusion that the defendants, H. F. Smith and Manley Smith, were acting together in an effort to save as much as they could out of the bankrupt's property. We are first impressed with the testimony of Attorney Cameron, attorney for H. F. Smith, who testified: I signed a stipulation in which I apparently appeared for Manley Smith. Manley Smith was with his father, H. F. Smith, at my office prior to the hearing (that is the hearing in bankruptcy). There were several hearings and he was with him and we entered into negotiations with the referee relative to holding the crops for a few days; we entered into this stipulation and after I had signed for my client, H. F. Smith, there was a line put down for Manley Smith, and as I understood it he was the owner of this southwest quarter (SW$\frac{1}{4}$) of section 9, and an assignment of the lease on the Indian land and I had counselled with him; I signed as his attorney. I think he was present at the time the stipulation was executed. I believed in good faith that I was entitled to represent Manley Smith at the time that I signed the stipulation. It is my recollection that on the hearing before the referee in bankruptcy, there were several of them; there was a great deal of conversation back and forth between

the attorneys and with the referee and I don't know but my recollection is that it was Mr. Zuger's (the referee's) suggestion that they enter into a stipulation; I believe his stenographer drew the stipulation. I think that Manley Smith left the room; where he went I don't know; but my recollection is that H. F. Smith stayed there all the time. I think I did talk to Manley. He was down in the car somewhere on the street. Manley Smith had been with his father in my office on several occasions before this hearing. I represented Mr. H. F. Smith and Manley Smith was with him on most of those occasions. We had this hearing, and the question came up about some way to handle the matter so as to salvage the crops without too much expense. This stipulation was dictated and I signed it on behalf of H. F. Smith, and the question came up about Manley Smith who owned the southwest quarter (SW$\frac{1}{4}$) and the Indian land, as we call it, the southeast quarter (SE$\frac{1}{4}$) of section 2, as to whether or not this land should not be covered by the stipulation. He was down on the street in the car and I think his brother-in-law was with him, and I started down to the street to see him and Mr. Smith stuck his head out of the window and yelled at him and said: "We want you up here." Then I am supposed to have said, and I believe I did say: "It wont be necessary. I can sign his name. He don't need to come." I signed that stipulation in good faith and I thought I was authorized to sign the stipulation on behalf of Manley Smith.

Now from this statement, which is uncontradicted, every time that Mr. Smith went to see his attorney about the bankruptcy matters, Manley was with him indicating that their interests were not adverse, but that Manley was doing what he could to help his father and was under his influence. When he was in the car down in the street, his father stuck his head out of the window and told him that he was wanted up stairs. What he was wanted for was, of course, to sign the stipulation, but Cameron who had gone down to get him then said it will not be necessary for I can sign his name for him. If Cameron had not said that, unquestionably Manley Smith would have gone up and signed the stipulation himself. The trial court found upon this testimony that the stipulation was signed with the authority of Manley Smith, and we are of the opinion that he was justified in so finding. This testimony also throws considerable light on the influence that H.

F. Smith had on his son, Manley Smith, always bringing him with him; keeping him present while he discussed his bankruptcy proceedings with his lawyer in such a way and to such an extent that the lawyer believed that he was representing both parties and at the trial he was very careful in his testimony not to divulge information that he got in confidence from either party.

According to the testimony of H. F. Smith, the creditors were pressing him very hard in 1926. He had been sued and he owed something over $7,000 that was not secured. He says that when Manley became twenty-one years of age and told him that he would prefer to go out and do for himself, he prevailed upon him to remain at home upon the condition that he was to pay him $200 a year and a little expense money. He worked for four years until he claims there was $800 due him. None of this agreed amount of $200 per year was paid to Manley Smith nor did he ask for any part of it until the fall of 1926 when the creditors were pressing H. F. Smith and there had been a request for another mortgage upon the land, and Manley then said that there was no use in him trying to do anything if everything was to be mortgaged up; then H. F. Smith conveyed to Manley Smith, the southwest quarter (SW¼) of section 9, for which he claims Manley paid him by canceling the account for $800 and assuming the mortgage of $3,200 upon the whole half section, the west half (W½) of section 9, which includes the quarter conveyed to Manley, and sometime later the tractor was conveyed to Manley, who assumed the indebtedness against it, and giving a mortgage on the crop to secure its payments. In the spring of 1927, H. F. Smith assigned to Manley Smith the lease of the land known as the Indian land.

At the time of the conveyance of the southwest quarter (SW¼) of section 9 to Manley, he had no property but a horse and saddle; at the time the Indian tract was conveyed he had the horse and saddle, a deed to the quarter section of land upon which he owned $3,200, and he owed some $1,300 on the tractor. When the trustee in bankruptcy, under the stipulation, took possession of all crops raised upon the land that year he filed a laborer's lien against the crop raised on the northwest quarter (NW¼) of section 9, his father's homestead, apparently in an effort to prevent the creditors from getting that. He lived

at home, the same as always, and farmed all the land together with his father.

Arthur Porter testified in substance: That I came to my father-in-law's house in February 1927; that my father-in-law proposed to sell me his automobile for $200 and that I purchased it at that time for that sum. I earned this money working in a radiator shop at Yankton, for one Ferris, who is now in Minnesota; that I got $35 per week; I have a wife and one child; I had a bank account at Yankton in the Dakota National Bank; that I am not positive but I think that I wrote a check when I drew the money out; that I had close to $200, maybe less, when I drew it out in February, or the last part of January; I could not say the exact amount; I did not keep all the money that I had in the bank. I probably had around $25 or $50; I kept it in a tin can in the trunk. I paid the car fare for myself and my wife up to my father-in-law's, at Selfridge, around $10 apiece, and I had somewhere between $200 and $300 when I got to Selfridge. I would not say the exact amount. I don't know exactly; no idea of the exact amount; between two hundred and three hundred dollars. After I drew the $200 out of the bank, I kept it in a tin can. In February I came up to Selfridge from Yankton to live with my father-in-law, H. F. Smith. I took the $200 in money out of the tin can and paid him.

This witness was still living with his father-in-law at the time of the trial in March, 1928, more than a year after he went to live with him. He doesn't know how much money he had when he got to Selfridge, or how much he took out of the bank. He can only tell approximately. But assuming that he did have between two hundred and three hundred dollars when he got to his father-in-law's, at Selfridge; he also had a wife and a child and was out of employment, and is it reasonable that under the circumstances and conditions he would take practically all of the money that he had in the world and invest it in an old secondhand automobile, and that his father-in-law would propose such a deal?

We are of the opinion that the evidence sustains the findings of the trial court and the judgment is affirmed.

BIRDZELL, CHRISTIANSON, and NUESSLE, JJ., concur.

BURR, J. (dissenting). I do not agree with the majority in the disposition of the property of Manley Smith, one of the appellants. Of course the bankrupt's property passes to the trustee, but not the property of third persons. The decision of this court takes from Manley Smith all of his equity in the (SW¼) of section 9, all the equity in certain crops for which he furnished the seed, and which he sowed, planted and harvested on the (SE¼) of section 2 in another township, and his equity in the tractor and plows for which he is obligated and on which he paid part of the purchase price.

The undisputed evidence shows that during his boyhood Manley Smith lived with his father, H. F. Smith, and worked on the farm. Up to the time he was 21 years of age he received no wages. Crops were poor and farming did not pay. In 1922 when he reached the age of 21 years he was dissatisfied with his outlook in life. There was no prospect of success in farming and he so told his father. The father told him he could not let him go, he needed him on the farm, and if he would remain with him he would give him $200 per year and some spending money and during the slack season he would have the right to work for neighbors and earn some more money. Under this agreement he remained with his father for four years. There were no crops, not even seed back at times, and he did not collect any of this money, for, as he says, he knew his father did not have it, there was nothing on which he could realize anything. When the creditors began to sue the father the son became anxious to know where he stood and so he asked his father about the money that was due, saying if the father was going to mortgage everything to the creditors he was going to quit. The father had nothing, but offered to deed him this quarter section of land,—the southwest quarter of section 9. There was a mortgage for $3,200 against this quarter and the father's homestead. In consideration of the deed, Manley Smith surrendered his claim for $800 and assumed the mortgage. In other words he agreed to pay $4,000 for this quarter section of land taking this load of debt off the father's shoulders, surely ample consideration. This was in November 1926—more than eight months before the father was adjudicated a bankrupt—and this deed was recorded at once. No creditor objected though all had notice. After the father filed his petition in bankruptcy, the creditors say the deed is fraudulent. The trial court held,

and the majority of the court confirm that this transaction was fraudulent,—made to defraud the father's creditors. There is not one word of testimony, or even an inference that supports this except matters which happened afterwards and which are entirely unconnected with this deal. The trial court is inclined to believe because the father became bankrupt, the son bobbed up to help him. This does happen at times; but is unreasonable here in the light of the evidence. The fact is the son remained on his father's farm and worked for four years. There is not one word of testimony showing he got anything for this service. That the young man, in the state of agricultural depression which reigned at that time, would become dissatisfied is a most reasonable statement. True he did not ask for his money, but, as he says, "I kind of knew the circumstances that Dad was in and did not ask him. . . . He was pressed with these creditors and hard up for money now and then and I knew he did not have the money to pay me." Of course he wanted to know where he was going to land when the other creditors started taking all the property. The father had a right to prefer his creditors and he certainly had a right to prefer his son. The decision of the majority of this court means that this boy does not get one cent for his four years of labor. It is said farm wages were then $40 per month and so the agreement to work for $200 per year is fictitious. But the boy was to get spending money in addition and the chance to work out. He says he did not get much "spending money" and it is not a stretch of imagination to believe this. The evidence shows it did not exceed $35–$40 a year. Where could the father look for a hired man in his financial condition, if not to the son?

Before a transaction can be said to be in fraud of creditors the evidence should be clear and convincing. To say that these transactions are fraudulent because forsooth, at a later time, the father and some one else entered into fraudulent transactions is stretching an inference to a great extent. Whatever may have been the motive of the father there must be fraud on the part of the son to set aside the transfer. The transferee must participate intentionally. Bank of Sanborn v. France, 49 N. D. 1, 177 N. W. 375; Baird v. Meyer, 55 N. D. 930, 937, 56 A.L.R. 175, 215 N. W. 542.

The second point where the decision is unjust to Manley Smith is

in regard to the crops on the Indian land. The father had a lease of the Indian land, he owed $112 previous rent, could not pay the rent, nor could he get seed from the county; he assigned his lease to the son, and the son then got a new lease from the Indian superintendent, agreeing to pay the father's past due rent. No one disputes this. This was six months after the deed, or in May 1927. The son furnished the seed, getting it from the county, put in the crop, cut it and was ready to thresh it when the trustee took charge of the boy's crop, against the protest of the boy. Somebody furnished the seed, certainly it was not the father. No creditors came to claim it for seed. Of course the boy furnished it and is bound to pay it. Much is said about a stipulation binding Manley Smith to the effect that the trustee in bankruptcy could take and finish harvesting the crop, but Manley repudiates the stipulation; certainly he never signed it. He says he never authorized it and Scott Cameron, the lawyer who signed the son's name to it, does not claim that he represented him. Manley was not present when the stipulation was drafted and signed. No one says he was and he says he was not. At one time Cameron said he thought the son was present when the stipulation was executed, but later he showed he was not. Cameron says he supposed he represented the son but that he could not say he represented him. Of course he did not. The record shows this clearly. He says himself "He never offered me any money, and I never sent him a bill and I never intend to." Messrs. Crum & Crum represented the son. They answered for him on October 29, 1927 and served the answer November 7, 1927. The stipulation was signed September 7, 1927, by Scott Cameron who was appearing for the father and who drew the answer for the father on November 8. Crum & Crum represented the son at the trial, and on this appeal. Simply because the son drove the car and brought the father in to see his lawyer, Cameron supposed he represented the whole family, and signed the boy's name to a stipulation. He did it in good faith; but mistakenly. In no other instance is there even a pretense that Scott Cameron ever acted as attorney for the son. However, here, where it is necessary to create a suspicion of fraud, this unauthorized stipulation comes in handy. And what bearing has this on fraud anyhow? The boy claimed the crop and the stipulation permits the trustee to thresh and market the grain upon executing an additional bond. Yet because

there was this stipulation signed by an attorney who did not represent the son and now does not claim to have represented him, and the trustee demanded the surrender of this crop, this stipulation is a circumstance against the son, showing fraud against the father's creditors. The son promptly disputed the trustee's right to take the crop, protested against it immediately after he was said to have stipulated it. Would he do so in a minor matter if he had just authorized it? If the repudiation came a long time afterwards it might be different, but it came at once. I would like to know what the boy gets for his years of service, for the seed that he furnished, and for the work that he did? Every dollar of his crop is taken from him and even his flax was taken for dockage.

It is said the subsequent transaction between father and son in regard to the tractor and plow is fraudulent. The trial court so found. I am not willing to approve this. The majority opinion dismisses this transaction by saying, "Sometime later the tractor was conveyed to Manley." The father did not give the tractor and plows to his son. What are the undisputed facts? The father owed the International Harvester Company for the tractor and plows, giving a mortgage on them to secure the purchase price. He could not pay. The company demanded settlement of some kind, and intended to foreclose the mortgage. The father wanted more time and during the negotiations the representative of the company suggested that the company would extend the time by taking the son as their debtor but not the father. The son assented to this. He needed machinery, he could not afford to buy a new tractor, he was familiar with this second hand tractor, had worked with it, and so he took it. The creditors had foreclosed on his father's machinery and taken everything. So the company canceled the father's indebtedness, gave him back his notes, gave a release of the mortgage and took notes and mortgage from the son, and thus the son became the owner of the tractor and plows. He bought them from the International Harvester Company, not the father. The father was losing them. This was in May 1927 just about the time the son got the lease on the Indian land from the Indian superintendent, furnishing the seed. Subsequently he made payments on the notes. I do not see how this can be said even remotely to be in fraud of creditors. The father had no equity in the tractor. The son is held

on his notes now owned by the Selfridge Hardware Company, and the tractor and plows are taken from him, together with the tools he bought and even the oil barrels for which he paid his own money.

Much is said about a labor lien which the son filed against his father's crop. When the son was harvesting the crops on the land which he bought he also harvested the father's crop, on the quarter north. When he was cutting he paid no attention to the division line. He had put in both quarters and it saved turning. This is natural. The son was not counting on defrauding anybody. It was easier to cut it that way. It was the father's crop and he says there was an agreement whereby the father was to give back to him the same amount of labor and when the creditors were coming in the son wanted something for his extra labor. So he filed this lien.

The father did not list the son as a creditor when he filed his schedule in bankruptcy and respondents say this is suspicious. Why should he? He did not owe Manley anything then except possibly on the labor lien and he may have never considered this. He says he overlooked it. If failure to list the son is suspicious it can affect the labor lien only. It would throw suspicion on the deed and other transactions if he had listed him.

If all these transactions were but parts of one transaction there might be some inference deducible; but the deed to the land is prior in point of time, unrelated to the other matters, and of such a character which is so fair and reasonable that I feel an injustice has been done. The same may be said of the lease of the Indian land and the tractor deal.

I agree with the majority of the court that the subsequent deal made between the father and son-in-law in March 1927 with reference to the Studebaker car appears fraudulent. This was an entirely different deal, and probably a put up job between the father and son-in-law to keep the car. I do not quarrel with this view. The son had nothing to do with it and should not be made a vicarious sufferer.

It is true that months later, when the father went into bankruptcy and controversies arose with creditors, the son appeared to side with the father and the two were at times together in their visits to the father's lawyer. The father appeared at times to be unwilling to arrive at a decision unless the son were present. Doubtless the son was help-

ing the father to save as much as he could. This is not unnatural; but all this is long after the transactions involved. This boy worked four years for nothing. He tried to get something for himself out of the wreck; he shouldered $4,500 of the debts, and agreed to pay this, and this is held suspicious. I am not unmindful of the consideration to be given to the findings of the trial court, but to my mind they are so clearly against the weight of the testimony as to work injustice. For this reason I dissent from the decision so far as it affects Manley Smith.